CARPENETI, Chief Justice,
with whom FABE, Justice, joins, dissenting.
I disagree with the court's conclusion that an experienced trial judge, who saw and heard the witnesses, committed clear error when she made the factual finding that Stephen O. posed a risk of onee again harming himself and therefore committed him to the care and custody of the State for 30 days.
Because I view the facts somewhat differently than today's opinion views them-and I view them more in line with the superior court's view-I begin with a recitation of the salient facts I then discuss each of the reasons advanced by today's opinion to reverse the superior court's factual finding and show that the court reaches its decision to reverse principally by re-weighing the evidence, in violation of our role as a reviewing court.
Facts
In 2004 Stephen O. heard "voices that told him to jump off a wall." He obeyed the voices [1] and, in an apparent suicide attempt, "jumped off a ledge some 16 to 18 feet high." He broke his ankle, gashed his head, sustained a concussion, and was temporarily wheelchair-bound as a result. This incident occurred at a hospital in Olympia, Washington; Stephen had been taken to the hospital by members of a church after he asked them to take him to a doctor. Following this incident, Stephen began receiving Social Security disability benefits for psychiatric illness. He was also prescribed Resperdal, an antipsychotic medication, which he took for approximately one to two years following this psychotic break.
In January 2010, Stephen's father became concerned about him again after Stephen's daughter reported that he was "creeping [her] out."[2] Stephen had begun waking his children up at night and talking to them about God, attending church, and following "a path of repentance." Stephen's father and daughter were alarmed because this behavior was very similar to Stephen's behavior in his previous psychotic break, where he reported hearing voices and "heading down a path of repentance" and then severely injured himself. Stephen's mother also considered this behavior to be abnormal because prior to early January 2010 she did not consider him to be a religious person.
Concerned for his safety, Stephen's parents reported his behavior to a community mental health clinician, who filed a petition for initiation of involuntary commitment on January 8, 2010. The petition identified the following facts that required an evaluation: "Client is presenting with psychotic features including hearing the voice of Jesus. Client exhibits behaviors similar to those he has exhibited in the past, prior to a suicide attempt."
On January 8, 2010, the Haines Police Department took Stephen into emergency custody under AS 47.80.705(a).[3] The follow *1198 ing day, Master Bruce Horton of the Sitka Superior Court issued an ex parte order to have him taken into custody and transported to Bartlett Regional Hospital in Juneau, "the nearest appropriate evaluation. facility," for an evaluation as provided for in AS 47.30.710(a).[4]
Stephen remained in the Haines jail from January 8 to January 14 because bad weather prevented his transportation to Juneau for evaluation. He arrived at Bartlett Regional Hospital on January 14, 2010. He was evaluated the next day by Dr. John Pappenheim, the medical director for psychiatric services. A 30-day commitment hearing was set for January 20, 2010:
Proceedings
On January 20, 2010, Superior Court Judge Patricia A. Collins conducted the 80-day commitment hearing. Dr. Pappenheim and Stephen testified regarding the State's request for Stephen's 30-day commitment. The court also considered a report by Elizabeth Ziegler, the court-appointed visitor. On January 27 and 28 the court heard further testimony from Dr. Pappenheim, Stephen, and Ziegler on the State's petition to administer medication.
Dr. Pappenheim gave expert testimony on the diagnosis of Stephen's mental illness and the risks associated with his behavior. He testified that Stephen "suffers from bipolar affective disorder, current manic with psychotic features." Dr. Pappenheim's diagnosis was based "in substantial part" on information he received from Stephen's father regarding his psychotic break six years prior and on interviews he conducted with Stephen. Stephen's father reported that during his prior episode of psychosis, Stephen was behaving "in precisely the same fashion" as in early January 2010: "once again [Stephen was] manifesting the presentation of hearing the voice of Jesus, becoming religiously preoccupied, wanting to head down a path of repentance." Stephen's father had confirmed that his recent change in behavior was a "substantial and marked departure from his previous condition." Dr. Pappen-heim was concerned because this departure "has historically been associated with behavior that's very harmful to [Stephen]."
Dr.'Pappenheim testified that "[Stephen] has a distinctively and abnormally persistent elevation, or expansiveness(,] of mood that's the singular feature of bipolar disorder." Dr. Pappenheim explained that Stephen's "very elevated ... if not modestly euphoric mood" was indicative of a problem because it was not congruent with the cireumstances of Stephen's unfortunate situation:
[It's this ... completely illogical, irrational response of everything's great [despite the fact that he's being held against his will, that] his children are no longer with him, and that his father thinks that he has a mental illness that needs to be treated, and that the psychiatrist that's been appointed to work with him thinks that he has a mental fliness that needs to be treated, and that [the psychiatrist] thinks he should take medication and [Stephen] doesn't want to take medication.
Dr. Pappenheim explained further that Stephen was incapable of making a decision about voluntary treatment because he was operating under the belief that he does not have a mental illness.
According to Dr. Pappenheim, Stephen's inability to understand his situation and refusal to accept treatment for it constituted grave disability. Stephen refused to take a mood stabilizer and an antipsychotic, which Dr. Pappenheim believed are "requisite treatment([s]" for someone with manic psychosis. Without treatment, Stephen was at risk of hurting himself as he had during his previous episode of psychosis, because "Iplast patterns of behavior are really the only good predictors of future behavior." *1199 Dr. Pappenheim acknowledged that there were no current allegations that Stephen had failed to care for himself or his children. But, based on the similarity between his current behavior and past episode of psychosis, Dr. Pappenheim explained that Stephen's refusal to accept treatment "places him in substantial danger of deteriorating condition, the development of a chronic psychotic process, [and] the risk of ... harming himself."
If Stephen were allowed to leave the hospital, Dr. Pappenheim's main concern was that his condition would "persist and worsen, [and] that he would at one point listen to a voice that would tell him to do something very dangerous and self harmful." Dr. Pap-penheim characterized Stephen's condition as a significant impairment. He explained that without treatment Stephen's condition was "not going to abate" and "there [would] be a chronic worsening" that may develop into "a chronic psychotic process." Ultimately, Dr. Pappenheim concluded that there was no less restrictive alternative to a 30-day commitment to ensure Stephen's safety and provide him with requisite care.
Stephen also testified at the hearing. He reported on the breakdown of his marriage and recent events in his life. He disputed his family members' reports that he had been behaving abnormally and he disagreed with Dr. Pappenheim's opinion that he was mentally ill.
The court also reviewed a report that outlined Stephen's meeting with Elizabeth Ziegler, the court-appointed visitor. In the report, Ziegler described Stephen as friendly and presenting well. The report noted his description of his previous psychotic break and treatment, and his current objection to taking medication. The report also described his mother's report of his previous psychotic break, and her concerns about his recent religiosity and behavior toward his children.
Acknowledging the "very high burden of proof that applies in this case, ... clear and convincing evidence," the superior court found that Stephen was "gravely disabled" under AS 47.30.915(7)(B). The court cited the following facts in support of its conclusion: (1) Stephen's prior psychotic break, hospitalization, and apparent suicide attempt; (2) his diagnosis of bipolar affective disorder, current manic with psychotic features; (3) his eligibility for and receipt of Social Security disability benefits for psychiatric condition (eligibility which was based on a "stringent test" administered by Social Security); (4) his daughter's report that he was "creeping [her] out"; (5) his family's concerns about the similarity between his current behavior and his behavior during his prior episode of psychosis; and (6) his belief that Jesus was telling him that he does not need mental health help. The court ordered that Stephen be involuntarily committed for 30 days.
Later, the superior court heard additional testimony on the petition to involuntarily administer psychotropic medication. In the interim, Dr. Pappenheim received records from the hospital in Olympia, Washington, where Stephen was treated during his previous psychotic episode. Dr. Pappenheim testified that the records strengthened his opinion that Stephen's hospitalization was appropriate "because of the markedly regressed psychotic state that [Stephen] came into ... and [his] concern that ... he would return to that at some point."
The superior court denied the petition to administer medication, concluding that there was not clear and convincing evidence that harm to Stephen was imminent because his mental condition had not deteriorated during the time he was in custody. Judge Collins continued the 30-day commitment order finding that Stephen was still gravely disabled, but declined to permit involuntary medication, noting that there was "an even higher burden that has to be met with respect to administration of psychotropic medications."
On January 29, 2010, Stephen was discharged early because the State's petition to involuntarily administer medication was denied, he refused to take medication voluntarily, and "gains [would] not be achieved without medication."
Discussion
(1) The ambiguity of Stephen's daughter's comment
The first reason advanced by today's opinion to support the conclusion that the trial *1200 court committed clear error is that the meaning of Stephen's daughter's comment was "unclear." The precise meaning of a 12-year-old's complaint that her father's actions-waking the child in the middle of the night and talking to her about Jesus and a path of repentance-were "creeping [her] out" may be uncertain, but in context it is certainly a piece of evidence that the superi- or court is entitled to consider and give weight to. The context-which today's opinion ignores-is that Stephen's actions frightened his daughter: "she remembered ... what had happened previously and was scared and went to her grandfather and expressed that concern." The majority's handling of this piece of evidence is just the first of many examples of re-weighing of the evidence. But weighing of the evidence is the trial court's function, not ours.
(2) "[MJarked differences" between Stephen's conduct in 2004 and 2010
The second reason advanced by today's opinion to support the conclusion that the trial court committed clear error were the "marked differences" between Stephen's conduct, behavior, and experiences in 2004 and in 2010. But it is the court today-an appellate court-which is finding "marked differences" between Stephen's circumstances in 2004 and 2010. It is not the trial court-which saw the witnesses and heard the evidence-nor is it Stephen's father or daughter. The trial court relied on the similarity of the situation in 2010 to that in 2004. Stephen's father characterized his son as behaving in "precisely the same fashion" as he had previously. Stephen's daughter's actions were characterized this way by the court in her comments to Stephen:
But for ... a child that remembers ... when you had this previous psych[otlic break and she almost lost her father to the event that you described on the stand in a way that was sort of chilling. Where whatever drove you to do it, you ... took action that could have easily led to your death.
Well, I don't blame a little 12-year-old girl for being real worried.
In short, in making its "marked differences" finding, this court simply re-weighs the evidence,[5] choosing to ignore evidence such as the testimony from Stephen's father that Stephen was behaving, "in precisely the same fashion" as his previous psychotic break, and Dr. Pappenheim's testimony that "past patterns of behavior are really the only good predictors of future behavior."
(8) Evidence of Stephen's bipolar disorder
The evidence of Stephen's bipolar disorder is clearly relevant to the superior court's ultimate determination. The superior court did not misuse or overstate this evidence. That courts should proceed with caution in this area, that evidence of mental illness alone is insufficient for hospitalization, and that treatment might be in a person's best interest but is also insufficient for hospitalization are nowhere challenged by the superi- or court's action. The majority's third reason for finding clear error is no reason at all to reverse the trial court.
*1201 (4) Stephen's mon-objection- to mental health help
The court next notes that "Stephen did not express any general objections to 'mental health help, but only to psychotropic medication." The basis for this statement is unclear. Stephen objected to both hospitalization and forced medication. He nowhere expressed a general "willingness to get treatment if the court so ordered it," as the court claims. All he said, as reported by the visitor, was that he objected to medication but that "if the court ordered him to take medication he would not harm people and would take an injection." If this is what the court relies on to support its argument regarding "Stephen's willingness to get treatment," it is a slim reed indeed. Stephen not only objected in the superior court to the administration of medication (and won), he believed that he was not mentally ill and objected to any treatment for mental illness, and he appealed the superior court's adverse decision on that issue.
The court then compares the facts of this case to those of In re Jeffrey E., where we upheld a commitment. I agree that Jeffrey E. is a stronger case for commitment, but that in no way means that the superior court erred in committing Stephen. And the court misses the holding of Jeffrey E.;: Alaska Statute 47.30.915(7)(B) is forward-looking in nature and calls upon the superior court to consider the probability that a person suffering from mental illness will deteriorate and harm himself. Here, the court gave great weight to the similarity of Stephen's actions in the previous case (when he harmed himself) and the present case, and it gave great weight to the expert's testimony that past patterns of behavior are the only good predictors of future behavior.
Finally, on the relationship between Stephen's religious beliefs and the superior court's findings, the court both mischaracter-izes Dr. Pappenheim's testimony and mis-tates the superior court's treatment of the issue. The court says Dr. Pappenheim testified that Stephen's beliefs were irrational and delusional "principally because they did not 'come from a cultural, historical context' but rather 'came out of the blue.'" But what Dr. Pappenheim said was this:
Now, if somebody had a religious belief that they grew up with that was part of their culture, that is considered a rational means for that belief. However, in [Stephen]'s case, the religiosity that he manifested started five years ago and led him to behave in a way that was substantially dangerous to himself and could have killed him.
(Emphasis added.) While Dr. Pappenheim emphasized the recency of Stephen's religiosity, he appears to have relied at least as much on the notion that the voices directed Stephen to throw himself off a building. With regard to the superior court, the majority suggests that the superior court was unduly concerned with Stephen's religious background. But the record shows that both parties had adduced substantial evidence on the subject and that Judge Collins merely made careful findings about it.
Conclusion
This was a difficult case. A troubled young man, suffering from mental illness, had a few years previously responded to voices directing him to leap from a building, seriously injuring himself. Again he was hearing voices. His worried family sought to obtain his hospitalization for his benefit and reported that he was behaving "in precisely the same fashion" now as he had in his previous psychotic episode. An experienced trial judge, after hearing from the patient and a psychiatrist who reported the family's concerns, found facts sufficient to support the determination that the patient was gravely disabled. Today's majority reverses that finding by re-weighing the evidence and substituting its judgment for the trial court's and by requiring a predictive capacity that no expert will be able to satisfy. Because I believe that the trial court did not clearly err, I respectfully dissent.

. Testimony at the commitment hearing was unclear as to whether Stephen heard the voice of Jesus or the voice of Lucifer.

. Neither Stephen's father nor daughter testified at the hearings in the superior court. Instead Stephen's father reported his reasons for seeking involuntary commitment to Dr. John Pappen-heim, Stephen's treating physician at Bartlett Regional Hospital.

. Alaska Statute 47.30.705(a) provides in relevant part:
A peace officer, a psychiatrist or physician who is licensed to practice in this state or employed by the federal government, or a clinical psychologist licensed by the state Board of Psychologist and Psychological Associate Examiners who has probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others of such immediate nature that considerations of safety do not allow initiation of involuntary commitment procedures set out in AS 47.30.700, may cause the person to be taken into custody and delivered to the nearest evaluation facility. A person taken into custody for emergency evaluation may not be placed in a jail or other correction *1198 al facility except for protective custody purposes and only while awaiting transportation to a treatment facility.

. Alaska Statute 47.30.710(a) states:
A respondent who is delivered under AS 47.30.700-47.30.705 to an evaluation facility for emergency examination and treatment shall be examined and evaluated as to mental and physical condition by a mental health professional and by a physician within 24 hours after arrival at the facility.

. The court also seizes on Dr. Pappenheim's statement that his conclusions about Stephen's condition hearing voices had "a bit of a speculative component to it," and then proceeds to refer to the doctor's "speculative conclusions." In fairness to the psychiatrist, I set out the entire exchange here:
Q: [by Stephen's lawyer] [Is there} anything to indicate that he's been hearing the voice of Lucifer?
A: Well, that's an interesting question. His father tells me that five years ago he was reporting he was hearing the voice of Jesus. When I specifically queried [Stephen O.] about that, he said, no it was the voice of Lucifer. Now, he was hearing a voice. And at some point, it was, according to his father, the voice [of] Jesus. At some point it turned to the voice of Lucifer. And I'm certainly concerned that what he's hearing now will not stay as it has been, and may change.
Q: - But that's just speculation, correct?
A: Well, I think it's a little bit more than speculation. But there's a speculative component to it, yes.
In the context of these questions and answers, the characterization of Dr. Pappenheim's testimony as self-admitted "speculative conclusions" is inaccurate. More, it suggests that we will require of testifying psychiatrists a type of prescience about the likelihood of a future disaster that would ill serve the interests of both the mentally ill and all Alaskans.